# Exhibit 2

**Deposition Transcript of Jesse Combs**

**May 24, 2022**

1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2   _____

3
    HUDSON TECHNOLOGIES, INC.; HUDSON
4   TECHNOLOGIES COMPANY, F/K/A ASPEN
    REFRIGERANTS, INC.,
5
              Plaintiffs,
6
      v.                        Case No. 1:21-CV-00297 (JPO)
7
    RGAS, LLC,
8
              Defendant
9

10  _____

11

12

13

14                    Deposition of

15                    Jesse Combs

16              Tuesday, May 24, 2022

17          8:00 a.m., Mountain Time

18

19

20

21

22

23

24
    Reporter: Barbara J. Carey, RPR
25  Job No:   211647

1                        J. Combs

2        A.   We're not -- we're not -- yeah, we're not

3   reacting feedstock chemicals to make refrigerants.

4        Q.   Okay.  And does RGAS have its own warehouses

5   where it stores its refrigerants, or do you contract with

6   third-party warehouses?

7                    MS. GABAY:  Objection to form.

8        A.   So again, I think it's important for us to

9   talk about time periods.

10       Q.   Sure.

11       A.   So what time period would you like to talk

12   about?

13       Q.   We can start, you know, that 2000 -- second

14   half of 2020, start there.

15       A.   So in the second half of 2020, RGAS did not

16   own any of its own warehouse facilities.  We outsourced

17   this.

18       Q.   Okay.  And when you said you outsourced, what

19   kind of services did those third-party warehouses provide?

20       A.   So they provided receiving, shipping, storage,

21   you know, assembly pallets of merchandise.  They also

22   provided -- you know, they would do all the -- the

23   Hazmat -- there were Hazmat-certified warehouses, so they

24   also provided the expertise in terms of hazardous

25   shipping, so bills of lading, creating the bills of

1                         J. Combs

2                    MR. DOROGHAZI:  That's okay.  I'll start

3    over.

4         Q.   In 2020, did RGAS employ anyone in-house, so

5    an RGAS employee, who was responsible for ensuring that

6    product was properly labeled?

7                    MS. GABAY:  Objection to form.

8         A.   So your question does not have the word -- the

9    new question is not were they an expert; right?  I just

10   want to make sure I understand your question.

11        Q.   My question is -- take a step back.  Let me

12   rephrase it again.

13             In 2020, did RGAS employ anyone directly whose

14   job responsibility it was to ensure that products were

15   properly labeled?

16                   MS. GABAY:  Objection to form.

17        A.   My understanding from speaking with employees

18   about this, is at that time we were relying solely upon

19   our third-party logistics warehouses for creating all of

20   our bills of ladings, and we were -- and so, therefore, we

21   were relying on them to make sure the shipments were

22   properly documented, et cetera, prepared for shipment as

23   hazardous goods have to be prepared.

24             Did that answer your question?

25        Q.   I think it does.

1                          J. Combs

2              So it sounds like the answer is, in 2020,

3    there was not a person employed directly by RGAS to

4    provide that service, but it was -- you were, instead,

5    relying on the third-party warehouses?

6              Is that a fair summary?

7        A.   I think that's a good summary.

8                   MS. GABAY:  John, do you have a lot more

9    questions on this topic, or are you switching topics?  I'm

10   just asking 'cause I need a bathroom break.

11                  THE WITNESS:  Yeah, time out.  Off the

12   record.

13                  MR. DOROGHAZI:  We can take a bathroom

14   break.

15                  (Whereupon, a recess was taken from

16                  9:08 a.m. to 9:15 p.m.)

17                  THE REPORTER:  We're back on the record

18   at 9:15.

19   BY MR. DOROGHAZI:

20       Q.   Just a few kind of random questions and then

21   I'm going to switch topics.

22              We talked a little bit about RGAS's activities

23   in the refrigerant market in 2021 and 2022.

24              In general, is it your view that sales that

25   have been made by RGAS during that time period have been

```
1                          J. Combs
```

2        A.   No, I would say, in 2020, we -- generally the

3   same, but probably -- probably more downstream customers,

4   probably more -- you know, it would be same general -- you

5   know, same markets, but different mix of -- yeah,

6   different percentage mix.

7        Q.   And I believe you mentioned that, you know,

8   the late '90s into the 2000s, you ran a company called

9   Coolgas; is that right?

10       A.   That's correct.  Yes.

11       Q.   Is Coolgas also a refrigerant distributor?

12       A.   It was.

13       Q.   And did Jason Crawford work for you at

14   Coolgas?

15       A.   He did.  Not during the whole time period, but

16   yes, he did.

17       Q.   Okay.  What part of the time period did he

18   work with you at Coolgas?

19       A.   I don't recall exact dates, but John, I would

20   say that he was probably there the last two or three years

21   that -- no, at least two or three years, you know, so call

22   it 2009, maybe, to 2012.

23       Q.   Okay.  And what did Jason do for you when he

24   was at Coolgas?

25       A.   I think, in the beginning, I think he started

1                           J. Combs

2   off as vice president.  He was hired on as vice president,

3   and then at the, you know, near the end, at some point, he

4   became president.

5          Q.   And then I believe you said you sold Coolgas

6   to A-Gas sometime in 2012; is that right?

7                     MS. GABAY:  Objection to form.

8          A.   Yes.

9          Q.   Okay.  And just make the record clear, I think

10  you said, as part of that transaction, there was some kind

11  of non-compete or prohibition on you engaging in the

12  refrigerant industry for a number of years?

13         A.   Yes, there was a non-compete agreement for, I

14  believe, it was five years.

15         Q.   In the U.S. market, I think, is what you said?

16         A.   Yes, and it -- you know, it wasn't

17  all-encompassing, but generally speaking, it limited me

18  from being able to transact, sell refrigerants in the --

19  in the U.S.

20         Q.   You said it limited you from selling

21  refrigerants.

22               Were you able to purchase refrigerants, or

23  were you barred from purchasing refrigerants as well?

24         A.   I wasn't barred -- you know, again, John, I

25  don't recall the specifics of the contract, but I do

1                          J. Combs

2   recall that I was -- certain refrigerants, I was able to

3   still purchase for the purposes of stockpiling, but not to

4   sell, and then, you know, with respect to some

5   refrigerants, I was allowed to sell them, but it's through

6   a supply agreement with the company that purchased

7   Coolgas.

8        Q.   Okay.  And did you, in fact, stockpile some

9   refrigerants during that non-compete period?

10       A.   I believe, yes, I believe in the U.S., I

11  believe in 2016 and possibly 2017, I did stockpile some

12  refrigerants, yes.

13       Q.   Do you recall what refrigerants?

14       A.   Primarily HFCs -- 134A.

15       Q.   Okay.  And in the Coolgas transaction --

16  strike that.  Let me ask it differently.

17            When Coolgas was purchased by A-Gas, did A-Gas

18  purchase Coolgas's entire inventory, or was there some

19  part of the inventory that was carved out?

20            MS. GABAY:  Objection to form.

21       A.   They purchased 100 percent of Coolgas's

22  inventory.

23       Q.   I think you said RGAS was founded in 2017 or

24  2018.

25            Does that sound right?

1                           J. Combs

2          A.   I believe that's correct.

3          Q.   At the time it was founded, did it have any

4     inventory?

5          A.   It did not.

6          Q.   Okay.  And jumping ahead here to the -- the

7     inventory that was at issue in the second half of 2020

8     with Hudson, where was that inventory purchased from?

9                    MS. GABAY:  Objection to form.

10         A.    Well, that is a really broad question because,

11    I mean, various places.  Yeah, I mean, some of it was

12    purchased domestically, some of it was imported, some of

13    it was purchased from affiliated companies.  Yeah, I mean,

14    I can't -- sitting here today, I can't recall where RGAS

15    purchased all of its inventory.

16         Q.   You said some of it was purchased from

17    affiliated companies.

18               What companies are those?

19         A.   One would be Combs Investment Properties, one

20    would have been a company called CGAS.  I think that's

21    it -- I'm sorry, there's another company called Combs Gas,

22    but I don't know if it had purchases from Combs Gas or

23    not, so...

24         Q.   The inventory purchased from Combs Investment

25    Properties and from CGAS, do you have any recollection of,

Page 60

1                          J. Combs

2    you know, when that inventory was originally packaged?

3                    MS. GABAY:  Objection to form.

4         A.    So can you be more specific, like talk maybe

5    specific refrigerants?

6         Q.    Sure, and we can go through the list.

7         A.    I'm just saying because, I mean, these are

8    like super broad, like super general questions.  I mean,

9    it's like -- you know what I mean?  It's like walking in

10   Walmart and saying, "Hey, do you all know when the

11   merchandise was purchased?"  You know, and there's

12   thousands of items, and it turns over a lot, so...

13        Q.    Let me ask it this way.

14        A.    Sure.

15        Q.    So, you know, RGAS purchased inventory from

16   Combs Investment Properties and CGAS, it sounds like, in

17   2018 or '17 when it was begun; is that right?

18                    MS. GABAY:  Objection to form.

19        A.    I don't recall the exact dates.  It would have

20   been as it needed product for its inventory, then it would

21   have made purchases, but it would have had to have been

22   after RGAS was formed.

23        Q.    Okay.  And, you know, for example, do you know

24   when Combs Investment Properties or CGAS had purchased the

25   R22 that it then later sold -- it later sold to RGAS?

1                       J. Combs

2        A.   They are.  It's my understanding, yes.

3        Q.   And your understanding is they're a company

4   that, you know, will sometimes buy refrigerants?

5        A.   Yes.

6                  MS. GABAY:  Objection.  Objection to

7   form.

8        Q.   And they're also sometimes a company that will

9   sell refrigerants?

10                 MS. GABAY:  Objection to form.

11       A.   Yes.

12       Q.   And within the market of distributors of

13   refrigerant gases, you know, what's Hudson's size relative

14   to other distributors?

15                 MS. GABAY:  Objection to form.

16       Q.   I'll ask it this way:

17            You know, is Hudson a large player in the

18   market or a small player, or somewhere in-between?

19       A.   No, I would say that they're a large player.

20       Q.   Do you have any knowledge if they're a large

21   player as it relates to the buying and selling of R22?

22       A.   Yes.  No, I believe that they are.

23       Q.   And R22 is also sometimes commonly known as

24   Freon.

25            Is that -- is that what it is?

1                          J. Combs

2    that time; is that correct?

3         A.    That's correct.

4         Q.    And it was looking to get rid of its entire

5    inventory; right?

6         A.    That was the goal.  Yes, that would have been

7    the goal.

8         Q.    And why did RGAS decide that it wanted to sell

9    its inventory?

10         A.    Well, as I referenced earlier, you know, I've

11    been involved in several businesses and, you know, the

12    refrigerant market or the refrigerant business was what I

13    would consider pretty depressed around this time period --

14    well, it had been for several years, especially

15    refrigerant distribution business, and, you know, I

16    believed that there would be a better allocation of the

17    capital that was being put in place -- put to work at RGAS

18    and some of the other industries that I participated in.

19         Q.    I actually asked this before, I apologize.

20               We were talking before about the services the

21    warehouse -- warehouses provided to you in 2020.

22               Do you recall that?

23         A.    Yes.

24         Q.    Do you recall, did the warehouses inspect

25    product that you purchased as it arrived at the warehouse

1                          J. Combs

2   continue to sell product, and obviously, that's working

3   towards a liquidation.  So I would say that was the first

4   and foremost step.

5              Then around, I believe, late July/early August

6   of 2020, I instructed Jason Crawford to reach out to other

7   larger refrigerant distributors to see if any of them

8   would have interest in purchasing our remaining inventory.

9        Q.   Okay.  And I take it one of those distributors

10  was Hudson?

11       A.   It was.

12       Q.   And was Jason instructed to ask the larger

13  distributors, like Hudson, to place a bid or some kind of

14  proposal to purchase all of the inventory?  Was that the

15  ask?

16              MS. GABAY:  Objection to form.

17       A.   I think -- generally speaking, I think he was

18  reaching out and asking them if they would be interested

19  in making an offer for our remaining inventory.  I

20  don't -- you know, as a company representative, I've seen

21  the word "bid" in some emails going back-and-forth, but I

22  wouldn't describe the process as any kind of formal bid

23  process.  It was very just general reaching out to

24  companies and asking them, "Hey, would you be interested

25  in making an offer on our remaining inventory?  If you

1                         J. Combs

2  product; is that right?

3         A.   Well, I think you've got a sort of -- I think

4  it's an overgeneralization, so in terms of trying to find

5  a company or customer that would purchase all of our

6  remaining product, yes, then, you know, that would have

7  been Jason.

8              However, you know, our sales -- our

9  salespeople were continuing to sell product every day and

10 continuing to reach out to others every day, and selling,

11 you know, product every day.  So, yeah.

12        Q.   Okay.  Yeah, let me -- let me be more precise,

13 which is in this effort to sell the entire inventory, that

14 was something that was assigned to Jason?

15        A.   Yes.

16        Q.   And was Jason authorized to, you know, reach

17 an agreement on that sale on his own, or did he have to

18 get your approval?

19             MS. GABAY:  Objection to form.

20        A.   No, he would have sought my approval.

21        Q.   Okay.  And was that -- was that a formal

22 requirement, or was that just his understanding of, you

23 know, working with you previously?

24             MS. GABAY:  Objection to form.

25        A.   I mean, I would say both.

1                        J. Combs

2                        MS. GABAY:  I'm sorry, what tab is that?

3                        MR. DOROGHAZI:  72.

4                        MS. GABAY:  72?

5                        MR. DOROGHAZI:  And I think it's

6    RGAS 1235 through 1239.

7         Q.   And this looks to be an email from

8    Mr. Crawford to you from the day before the email we just

9    looked at.  And there's a line in it that says, in this

10   email from Jason to you, "Either they don't have the money

11   or they just want the R22 and will take the other products

12   at break-even."

13              Do you see that?

14        A.   I do.

15        Q.   Do you have any understanding of what

16   Mr. Crawford meant by that phrase, "They just want the R22

17   and will take the other products at break-even"?

18                   MS. GABAY:  Objection to form.

19        A.   Well, at this point, I think we were starting

20   to -- yeah, I mean, they had -- they had, from the

21   beginning, they had offered to only take the R22, and we

22   always were sort of -- well, again, the question is what

23   Jason meant by this or...

24        Q.   Right.  I'm asking what you understood him to

25   be referring to?

1                          J. Combs

2         A.    Give me just a second, John.

3              I mean, I would think he means by "either they

4    don't have the money" is that, you know, we had -- well --

5         Q.    Yeah, I'm just asking you about the phrase,

6    "or they just want the R22 and will take the other

7    products and break-even."

8         A.    Got it.

9         Q.    I'm just asking you what your understanding is

10   of that portion of the email?

11        A.    My understanding wouldn't be anything more

12   than what it says, which is, "Or they just want the R22

13   and will take the other products at break-even," meaning

14   that they -- I mean, the R22, of all these gases at this

15   particular time, would have been the most desirable, and,

16   you know, because we were pretty adamant about wanting to

17   sell all of the merchandise together, because we didn't

18   want to be left with the non-R22 products without R22 to

19   sell along with it, I think he's basically assuming that

20   he understands -- I think -- my best understanding would

21   be from looking at this that the context here from Jason

22   is that they probably just want the R22, but what he's not

23   saying, but I think he's implying, is that they know that

24   we're not going to sell them just the R22.  So it's

25   like -- you know, they probably just want the R22 and will

1                          J. Combs

2  take the other products at break-even.

3          Q.   Okay.

4          A.   But again, I mean, that's an assumption.  I

5  mean, without -- this is an email from Jason to me.  It's

6  hard for me to say what he means.

7          Q.   Got it.

8                  MR. DOROGHAZI:  And can you turn to

9  Tab 47, which is going to be marked as Exhibit 9.

10                 (Whereupon, Exhibit 9, Text Messages Bates:

11                 RGAS000608 to 617, was marked.)

12                 MR. DOROGHAZI:  And it's RGAS 609 to

13  RGAS 617.  Let me know when you're there.

14                 THE WITNESS:  Okay.  I'm here.

15         Q.   So first of all, I think I got this right, but

16  I want to make sure.  This looks to be screenshots from

17  your phone with communications with Jason Crawford.

18                 Is that right?

19         A.   I don't -- what are you basing that on, John?

20         Q.   I'm basing it on that I don't think anyone

21  else has told us they sent text messages, and it's got a

22  picture of Jason as the contact, and the context appears

23  to be you and Jason talking, but I'm just trying to make

24  sure that's accurate.

25                 MS. GABAY:  Objection to form.

1                            J. Combs

2         Q.   So you may not have been focused on them, but

3    you were aware they existed; right?

4                   MS. GABAY:   Objection to form.

5         A.   You know, honestly, John, sitting here today,

6    I can't -- I can't say -- I mean, I'm obviously aware they

7    exist today.  As a company representative, I've seen these

8    documents dozens of times in the last year.  If I, you

9    know, go back into September 23rd, I do not recall having

10   any specific discussions around Schedule A or -- is it B,

11   the other one?

12        Q.   I think the other one is Schedule B, yes.

13        A.   Sorry, I said "E" earlier.

14             Yeah, I don't recall having any specific

15   conversations around --

16        Q.   Yeah, my question wasn't if you had a

17   conversation about it.

18             My question was if you were aware they

19   existed?

20        A.   I don't recall being aware that they existed

21   on September 23rd.

22        Q.   Or September -- I think September 24th is when

23   you got this email.

24        A.   Sorry, yeah, I don't recall them existing on

25   September 24th.

1                        J. Combs

2   that happened within a few days after September 23rd;

3   right?

4        A.   From my review of the emails, it happened

5   really quick, yeah, like within two or three days.

6        Q.   And wasn't the result of the Progressive

7   inspection that Hudson determined that most of the product

8   was not labeled to meet DOT and GHS requirements?

9             MS. GABAY:  Objection to form.

10       A.   From reading through the emails, it appears

11  that that's what Hudson believed to be the case.  I don't

12  believe that to be the case, but that's what Hudson

13  believed to be the case.

14       Q.   And did RGAS ever tell Hudson it disagreed

15  with that conclusion?

16            MS. GABAY:  Objection to form.

17       A.   You know, I recall having conversations with

18  Jason about it when -- after they performed the

19  Progressive inspection, and Jason said, you know, "They're

20  referencing these labeling deficiencies.  They want us to

21  add all these labels."

22            We did not -- we told Hudson -- my

23  understanding is Jason told Hudson that, "The product is

24  fine, we don't -- there's no issues with the product.

25  It's the same product we've been selling you.  It's the

1                          J. Combs

2    same product that we've been selling to hundreds of other

3    customers for the last several years.  No one has ever

4    objected to the product."

5              Beyond that, no, I don't think that we went

6    into any particular analysis at the time.  We were just

7    more interested in, you know, selling this product, and I

8    think that the follow-up was Jason, rather than doing

9    that, he just went back to Hudson and said, "Hey, just

10   make us a new proposal with, you know, discounted prices,

11   and you deal with whatever -- if you think it needs more

12   labels, then you can add the labels."

13        Q.   And Hudson didn't agree to give discounted

14   prices; right?

15              MS. GABAY:  Objection to form.

16        A.   That's not exactly correct.  In the beginning,

17   Star responded and said that -- that it would only be the

18   cost of the labels and that she would look into it and get

19   back to him.

20              Ultimately, in the end, they -- they ended

21   up -- in the end, they ended up just offering a whole new

22   proposal, like a week later around -- I think it was

23   actually around October -- around October 8th.  So it was

24   probably almost two weeks later.  They just submitted a

25   brand-new proposal for only specific products.  They

1                         J. Combs

2   excluded everything else.

3         Q.   Didn't Jason request that they submit a new

4   proposal?

5                    MS. GABAY:  Objection to form.

6         A.   Jason requested they submit a new proposal --

7   sorry, I don't know if I'd call it a new proposal.  He

8   suggested that they submit -- he basically asked them to

9   offer a price taking the product as-is, you know, the

10  labeling as-is.  And yes, so he did ask them to do that.

11        Q.   They ultimately did not propose a price to do

12  the relabeling inhouse; right?

13        A.   I'm going off of memory and looking at the

14  emails.  Star, she gave -- she threw out like an estimate,

15  I believe.  If you have it in the documents, I'm happy to

16  go to it and recite it, but --

17        Q.   I'm not aware of an estimate.

18        A.   Yeah.  No, she -- her estimate didn't have an

19  exact amount.  It said the cost of the sticker.  So, you

20  know, that and -- and that was in response to Jason

21  asking, "If you all handle the labeling inhouse, what

22  would it be?"  And she said it would be the cost of the

23  sticker.

24        Q.   Let's take a look at Tab 26, which would be

25  Exhibit 15.

1                        J. Combs

2              MS. GABAY:  Objection to form.

3      A.   At or around the time of the lawsuit?

4      Q.   Correct.

5      A.   No.

6      Q.   And I think my understanding was that RGAS

7  relied on the warehouses to ensure that product was

8  properly labeled and packaged; right?

9              MS. GABAY:  Objection to form.

10     A.   Properly labeled?  Those are, like, two

11  different questions.  One is properly labeled, and one is

12  properly packaged.  Those are sort of two completely

13  different topics.

14     Q.   Well, okay.

15          The question is, did you rely on the

16  warehouses to ensure that the product was properly

17  packaged?

18              MS. GABAY:  Objection to form.

19     A.   We would have relied on warehouses to ensure

20  that product was properly labeled before it would ship out

21  of the warehouse, yeah.

22          Does that answer your question?

23     Q.   Yeah.  Would you rely on the warehouse to

24  ensure that it's properly packaged?  Because you said

25  packaging and labeling is two different things.

1                          J. Combs

2        A.   Yeah, I don't -- I personally don't recall

3   specifically looking at any photos at or around that time

4   that Hudson provided or might have provided.

5        Q.   And you don't recall Debbie Cook looking at

6   photos, either; right?

7        A.   I don't recall, no.

8        Q.   And do you recall Jason Crawford engaging in

9   that kind of analysis?

10       A.   I personally don't, no.  Huh-huh.

11       Q.   Would there be anyone else besides you, Jason,

12  or Debbie that would have done that for RGAS?

13       A.   Not that I can think of off the top of my

14  head.

15       Q.   You obviously said RGAS didn't engage an

16  expert to review the labeling at that time; right?

17                 MS. GABAY:  Objection to form.

18       A.   Not at that time, no.

19       Q.   And did RGAS engage any kind of third party to

20  review the labeling at that time?

21                 MS. GABAY:  Objection to form.

22       A.   Not that I can recall.

23       Q.   Okay.  And so going back to the document in

24  front of you, I'm just trying to orient us.  This email

25  string, as I understand it, is -- contains Hudson's

1                          J. Combs

2       Q.   And was it sold at the same price that was

3  listed on the September 23rd purchase order?

4                 MS. GABAY:  Objection to form.

5       A.   I believe it was, to the best of my knowledge.

6       Q.   And was all of the product that was sold to

7  Hudson from Progressive sold at the prices that were

8  listed on the September 23rd purchase order?

9                 MS. GABAY:  Objection to form.

10      A.   To the best of my knowledge, yes.

11      Q.   And then at some point in October, there was

12 inspections that occurred of the other warehouses; right?

13                MS. GABAY:  Objection to form.

14      A.   No.  To the best of my knowledge, I don't --

15 sorry.  Are you asking me based on -- at the time in 2020,

16 or my knowledge today?

17      Q.   I'm just -- well, you're here as a company

18 representative, so obviously, it's going to be based on

19 your knowledge today.  Let me ask it this way:

20                Based on your knowledge today, approximately

21 when were the rest of the inspections completed for the

22 other three warehouses?

23      A.   Well, so my understanding is that RGAS did not

24 receive any results of any other inspections from the

25 other warehouses from Hudson until around -- no, November.

```
 1                          J. Combs

 2         A.   Correct.

 3         Q.   Did you ever check those products to see if

 4    they were actually missing DOT-39 markings?

 5                   MS. GABAY:  Objection to form.

 6         A.   Me, personally?

 7         Q.   RGAS.  Did RGAS ever determine whether those

 8    products were, in fact, missing DOT-39 markings?

 9         A.   No.

10         Q.   Even after the time period we've been talking

11    about in 2020?

12                   MS. GABAY:  Objection to form.

13         A.   I wouldn't say we ever checked those products

14    to see if they were missing DOT markings, no.  I mean,

15    that would have been -- I mean, that would be a pretty big

16    task.

17         Q.   So did RGAS ever relabel any of the products

18    in Murphy Bond, Bonded All South, or Dunavant Warehouse

19    after the Hudson deal did not happen -- or strike that.

20              Let's say -- my understanding is the Hudson

21    deal ends, for lack of a better word, around

22    November 15th, 2020?

23         A.   I don't know where you come -- I come up with

24    November 12th.  And I wouldn't say it ends, I would just

25    say the negotiations stopped.
```

```
 1                        J. Combs
 2      Q.   So let's put it this way:
 3           However you want to phrase it, the Hudson
 4   activity ends around November 12th; right?
 5      A.   That's my understanding, is November 12th.
 6   Yeah, you referenced November 15th.  I don't recall
 7   anything after November 12th.
 8      Q.   Okay.  So just using that time of
 9   November 12th on, was any of -- did RGAS relabel any of
10   the inventory identified by Hudson in this email from
11   Hannah any time after November 12th?
12                   MS. GABAY:  Objection to form.
13      A.   I wouldn't say that we -- no, we did not
14   relabel, no.  I mean, I guess, what's your definition of
15   "relabel"?
16      Q.   Did you add any labels to these products after
17   November 12th?
18      A.   Yes, we did add some labels to some product
19   after November 12th.
20      Q.   What product did you add labels to?
21      A.   Oh.  Specific products?
22      Q.   Yeah, every product that you can remember that
23   you've added labels to -- not like canister-by-canister,
24   but by type and warehouse.
25      A.   Sure.  You know, John, sitting here, I don't
```

1                          J. Combs

2   recall exactly what labels were added, but there were

3   definitely labels added to products after November 12th,

4   2020.

5         Q.   Was it -- did you keep any record of what

6   products had labels added to them?

7         A.   We might.  We might have.  I'm not 100 percent

8   sure.

9         Q.   Who added the labels to these products for

10  you?

11        A.   That would have been people at the warehouses,

12  like -- you know, the warehouses, basically.

13        Q.   Okay.  So you all hired the warehouses to add

14  certain labels?

15        A.   Yeah, we just -- we just -- yeah, asked them

16  to add labels to products that they're --

17        Q.   And how did you decide what labels to add to

18  the products?

19                  MS. GABAY:  Objection to form.

20        A.   Well, you know, to the best of my knowledge, I

21  think we just added labels to everything, I think, like,

22  just because -- yeah, I think we just added labels to

23  everything.

24        Q.   How did you determine what labels to add to

25  each product?

1                           J. Combs

2          MS. GABAY:  Objection to form.

3      A.   I don't -- I don't recall exactly how we

4  determined what specific labels to add.  I think we

5  added -- yeah, I don't recall, like, the exact labels.  I

6  just -- I know that I gave instructions to add labels to

7  our products at the other three warehouses we've been

8  referencing, the non-Progressive Warehouse.

9      Q.   Were they the same labels identified in this

10 email as missing by Hudson?

11          MS. GABAY:  Objection to form.

12          Which email are you referring to?

13     A.   Yeah.

14     Q.   RGAS 1170 to 1172, which is the November 10th

15 email from Hannah Baker?

16     A.   Let's see.  So looking at the Pasadena

17 Warehouse, they did not request us to add any labels to

18 the R22, so that would -- yeah.  Same with the 134A.  The

19 R22, 115 pounds needs statement warning.  Yeah, the 125

20 pounds -- well, you know, I know we added some labels to

21 R22.  Hudson, in this November 12th email or 10th email --

22 or 11th, sorry -- November 10th email, they didn't request

23 we add any labels to R22.  So I guess that wouldn't --

24          What was your question again, because --

25     Q.   Sure.  My question to you -- let's take a step

1                         J. Combs

2                 THE WITNESS:  No worries.

3         A.   So I think -- I think on this we can probably

4    just cut to the chase, John.

5                 After we were served with a lawsuit, I think

6    in kind of mid-January 2021, you know, obviously, I read

7    through the lawsuit and saw that Hudson was making these

8    allegations that our product somehow was not DOT

9    compliant, not GHS compliant, and I went to an operations

10   manager, Greg Burmeister at Atomic Capital, and basically

11   just tasked him with, you know, "Can you come up with a

12   sort of catchall label?"  Actually, I just tasked him

13   with, like, reviewing it, you know, looking at what should

14   be -- you know, just kind of reviewing their claims and

15   making sure that we didn't have a situation where we had

16   any product that might have had a labeling deficiency,

17   and, yeah, basically turned that project over to him.  And

18   my understanding from talking with him after the fact was

19   that I think he basically just came up with some catchall

20   labels by product type.  So, you know, he did his best

21   effort at understanding, you know, what would be required

22   and made a label with all those requirements with, you

23   know, never actually physically inspecting the product.

24   The idea was just, you know, he made the determination it

25   would be a lot less expensive for us to just add a label

```
 1                         J. Combs
 2  to all the product that we had remaining rather than to
 3  actually determine, you know, like physically send staff
 4  to each warehouse and going through thousands of cylinders
 5  to determine if there was, in fact, any product or
 6  products that were deficient in labeling.
 7              So does that answer your question?
 8        Q.   That does.
 9              And so I think you said -- but I want to make
10  sure -- he didn't make a determination one way or the
11  other about whether the product -- the product's prior
12  labeling was compliant?
13        A.   That's correct.
14        Q.   And do you recall how much it cost to have all
15  the product relabeled?
16        A.   I would estimate it was, you know -- you know,
17  10-, 15,000 to maybe $20,000 max.  You know, I mean, it's
18  difficult because there also was a lot of staff time that,
19  you know, you just don't have any way of knowing exactly
20  how much that was, but the actual labels themselves and
21  the cost of having them added, I would think, is somewhere
22  in the $20,000 plus-or-minus range, maybe less.
23        Q.   Okay.  And you said that's $20,000 was the
24  actual cost of the labels, then whatever you had to pay
25  the warehouse staff to put the labels on the boxes?
```

1              CERTIFICATE

2              I, Barbara J. Carey, Registered Professional

3    Reporter and Certified Shorthand Reporter, do hereby

4    certify that prior to the commencement of the examination,

5    Jesse Combs was duly remotely sworn by me to testify to

6    the truth, the whole truth and nothing but the truth.

7              I DO FURTHER CERTIFY that the foregoing is a

8    verbatim transcript of the testimony as taken

9    stenographically by me at the time, place and on the date

10   hereinbefore set forth, to the best of my ability.

11             I DO FURTHER CERTIFY that I am neither a

12   relative nor employee nor attorney nor counsel of any of

13   the parties to this action, and that I am neither a

14   relative nor employee of such attorney or counsel, and

15   that I am not financially interested in the action.

16

17

18

19

20   *Barbara J. Carey*

21   BARBARA J. CAREY

22   Registered Professional Reporter

23   Certified Shorthand Reporter

24   Notary Public

25   Dated:  June 6, 2022