# Exhibit 3

**Deposition Transcript of Jason Crawford**

**April 13, 2022**

Page 1

1

2                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
3

4   HUDSON TECHNOLOGIES, INC.; )
    HUDSON TECHNOLOGIES        )
5   COMPANY, F/K/A ASPEN       )
    REFRIGERANTS, INC.,        )
6                              )
                 Plaintiffs,   )
7                              ) CASE
            vs.                )
8                              ) NO: 1:21-CV-00297 (JPO)
    RGAS, LLC,                 )
9                              )
                 Defendant.    )
10

11

12

13

14

15          DEPOSITION OF JASON M. CRAWFORD

16                 DALLAS, TEXAS

17          WEDNESDAY, APRIL 13, 2022

18

19             (Reported Remotely)

20

21

22

23   REPORTED BY:  TANYA L. VERHOVEN-PAGE,
                   CCR-B-1790
24

25   JOB NO.  209700

```
1                          J. CRAWFORD

2       A       The end of December, December 31st, 2020.

3       Q       And was your employment terminated or did

4   you resign?

5               MS. GABAY:  Objection to form.

6               THE WITNESS:  Terminated.

7   BY MR. DOROGHAZI:

8       Q       Was a reason given to you why you were

9   terminated?

10      A       The business wasn't performing as

11  Mr. Combs had anticipated.  The return on investment

12  wasn't -- was about nonexistent.  I mean, the returns

13  weren't good.  So early to mid part of 2020, he

14  decided to exit the business and sell the remaining

15  inventory and told me that my job would -- would come

16  to an end at the end of the year.

17              So my -- that was -- and he was, you

18  know, not going to sell refrigerant any longer.  Just

19  essentially get out of the refrigerant business at

20  that time.

21      Q       Was your termination in any way connected

22  with the Hudson transaction in any way?  Meaning --

23  let me re-ask it.

24              Was your termination in any way connected

25  to how the Hudson transaction occurred?
```

1                      J. CRAWFORD

2          that was his decision, not my decision.

3     BY MR. DOROGHAZI:

4          Q      Fair enough.  But was Mr. Combs' view

5     that the return on investment was not sufficient in

6     the refrigerant gas market and that's why he wanted

7     to exit it?

8          A      Yes, the money -- yeah, the return was

9     not sufficient.

10         Q      And I think that you mentioned, at some

11    point in 2020, the price of refrigerant gasses was

12    depressed; is that right?

13         A      Depressed, they were at historical lows.

14         Q      And was that in the first part of 2020?

15         A      To the best of my knowledge and

16    recollection, it was all of -- pretty much all of

17    2020.

18         Q      Okay.  I think I saw in one of the

19    documents a mention of a company or a thing called

20    BMP.  Does that ring a bell?

21         A      BM?

22         Q      Yeah, BMP.

23         A      Yes.

24         Q      What is that?

25         A      The BMP, if you're referring to

1                          J. CRAWFORD

2    the president of RGAS to go out and solicit bids for

3    someone to purchase the inventory of RGAS?

4         A     Yes, I was -- that was -- yeah.

5         Q     And do you recall when you started

6    soliciting bids for the sale of RGAS' inventory?

7         A     I don't know the specific dates.  You

8    know, approximately, I think, the mid part of 2020.

9         Q     Got it.  And do you recall ever reaching

10   out to Brian Coleman at any point about the sale of

11   RGAS' gasses inventory?

12        A     Yes.

13        Q     And who is Brian Coleman?

14        A     Brian Coleman, currently, I think -- to

15   the best of my knowledge -- is the CEO of Hudson

16   Technologies, refrigerant distribution.

17        Q     And why did you contact Brian?

18        A     We were wanting Hudson -- or to gauge

19   Hudson's interest in purchasing the remaining

20   inventory of RGAS.

21        Q     And I assume you reached out to Hudson

22   because it's a refrigerant gas company, you thought

23   they might be interested in buying the inventory?

24              MS. GABAY:  Objection to form.

25              THE WITNESS:  Yes, they're -- I

Page 77

```
 1                         J. CRAWFORD
 2   BY MR. DOROGHAZI:
 3        Q     And as the president of a refrigerant gas
 4   company, did you do anything to educate yourself
 5   about what regulatory requirements there were for
 6   your company to conduct business?
 7        A     I was -- I had general knowledge.  We had
 8   an operations team that knew those regulations.
 9        Q     So you relied on your operations team to
10   ensure that there was compliance with government
11   regulation?
12        A     Yes.
13        Q     And who from your operations team was
14   involved in the sale of RGAS' inventory in late 2020?
15             MS. GABAY:  Objection to form.
16             THE WITNESS:  Who was involved in
17        what aspect?
18   BY MR. DOROGHAZI:
19        Q     Sure.  Was -- I'll ask it this way.
20             Was anyone from your operations team
21   involved in the Hudson transaction?
22        A     Yes.
23        Q     Who?
24        A     Debbie Cook, Christina Wiggins.  I
25   believe those are the -- Katrina Bobbinger, I
```

1                      J. CRAWFORD

2  believe, if I can recall.

3        Q    You mentioned three individuals.  The

4  first, Debbie Cook.  What was Debbie Cook's role at

5  RGAS?

6        A    I believe her title is internal auditor.

7  She handled logistics, along with Christina Wiggins.

8        Q    What was Christina Wiggins' title?

9        A    She kind of had a hybrid title.  I don't

10  remember her specific title, but she -- she handled

11  sales at the time and also helped with logistics.

12        Q    You mentioned Katrina?  Is that her name?

13        A    Yes.

14        Q    Bobbinger?

15        A    Yes.

16        Q    What was her title?

17        A    I think she was -- we let her go and I

18  can't remember what time or when it was.  So I don't

19  know -- she might have been gone before the Hudson

20  transaction.  I'm not sure.  She might have been on

21  the front end of it, I can't remember the specific

22  time that she was let go.

23          But she handled the logistics, freight,

24  transportation logistics.

25        Q    And did you -- which one of these three

1                    J. CRAWFORD

2  women did you consult with about any regulatory

3  issues that might arise in the Hudson transaction?

4            MS. GABAY:  Objection to form.

5            THE WITNESS:  We had no reason to

6       consult with anyone in regards to

7       potential issues in relation to this

8       transaction.

9  BY MR. DOROGHAZI:

10      Q    We've been on a little bit of a tangent,

11 but going back to Exhibit 3, which is Tab 33 in your

12 binder, at the bottom of RGAS 18 there's a number

13 six.

14           Do you see that?

15      A    Yes.

16      Q    And that was just you confirming, again,

17 for Hudson that this is an all-or-none bid, right?

18      A    Yes.

19      Q    And all-or-none means selling everything

20 or selling nothing, right?

21      A    Yes.

22      Q    For the other potential bidders that you

23 spoke with, were they supplied similar information to

24 what Hudson was told about the bid?

25           MS. GABAY:  Objection to form.

1                      J. CRAWFORD

2              THE WITNESS:  What do you mean,

3        similar information?

4   BY MR. DOROGHAZI:

5        Q     Sure.  Let me ask it differently.

6              Were there any specific conditions that

7   you gave to other bidders that differed from the

8   conditions that you told Hudson for the bid?

9              MS. GABAY:  Objection to form.

10             THE WITNESS:  We didn't have any

11       other bidders that we got this far along

12       with as we did Hudson.  So information

13       was different.

14  BY MR. DOROGHAZI:

15       Q     When you say got as far along with, what

16  does that mean?

17       A     Where we moved into pricing.

18       Q     Okay.  So that means that other bidders

19  may have asked you some questions but never submitted

20  a specific pricing bid?

21       A     As I recall, there was not -- the

22  interaction with other potential bidders is that they

23  weren't interested in the volume, so it never

24  progressed further than that.

25             MS. GABAY:  John, should we take

1                          J. CRAWFORD

2          situation, I don't -- I can't say that I,

3          at the time, understood this to mean that

4          they were the shipper of the product.

5    BY MR. DOROGHAZI:

6          Q    Did you understand it to mean that Hudson

7    was going to be sending someone to pick up the

8    materials from a location where RGAS had it stored?

9          A    I mean, I didn't really, at this point,

10   you know, think that too deeply into what -- I mean,

11   it was the package -- the product was packaged

12   correctly, and I didn't put much thought into, you

13   know, the freight aspect of it.

14         Q    How did you know the package -- sorry.

15              How did you know the product was packaged

16   correctly at this time?

17              MS. GABAY:  Objection to form.

18              THE WITNESS:  Packaged correct, can

19         you define correctly?

20   BY MR. DOROGHAZI:

21         Q    You just used those words.  I'm literally

22   using your words.

23         A    That it -- that the packaging met the DOT

24   packaging requirements and, to the best of our

25   knowledge, all of the product met the requirements

Page 93

```
 1                          J. CRAWFORD
 2    and we had no reason to believe otherwise.
 3         Q    Had you conducted any inspection of the
 4    products to confirm that it was legally packaged or
 5    correctly packaged?
 6              MS. GABAY:  Objection to form.
 7              THE WITNESS:  A lot of this product
 8         was new.  We don't -- it's not industry
 9         norms to inspect material.  We knew the
10         product or, to the best of our knowledge,
11         thought the product was in compliance and
12         we didn't perform specific inspections in
13         relation to this transaction to ensure
14         compliance.
15    BY MR. DOROGHAZI:
16         Q    What was the basis for your knowledge
17    that it was legally packaged?
18              MS. GABAY:  Objection to form.
19              THE WITNESS:  Based on our
20         operations staff and -- was knowledgable
21         about the regulations, we believed our
22         product was in compliance.
23    BY MR. DOROGHAZI:
24         Q    And this may be a question for your
25    staff.
```

```
 1                        J. CRAWFORD

 2              How did they know it was in compliance?

 3    What gave them the belief that it was in compliance?

 4         A      Their knowledge.

 5              MS. GABAY:   Object to form.

 6    BY MR. DOROGHAZI:

 7         Q      I believe you said their knowledge?

 8    Their knowledge of what?

 9         A      Their knowledge of the regulations.

10         Q      So besides their knowledge of the

11    regulations, how did they know that the packaging --

12    or what was the basis for their belief that the

13    packaging was correct?

14         A      Well, their basis of their belief is

15    their knowledge of the regulation.

16         Q      Did they ever -- so had they ever

17    inspected the packaging at all, not even in

18    connection with the Hudson transaction?  Like had

19    they previously inspected it?

20         A      When the package -- some of the product

21    was purchased from other suppliers and that product

22    is inspected upon arrival to our warehouse.  Some of

23    the product is manufactured.  Those labels and

24    cylinders are affixed with the correct DOT labeling,

25    environmental, regulatory labeling, packaged.
```

1                          J. CRAWFORD

2              That art work is known and the material's

3     packaged in that art work that's been approved.

4         Q     Do you know when most of the -- strike

5     that.

6              You mentioned that there was some product

7     that had been manufactured.  Do you know when it had

8     been manufactured?

9              MS. GABAY:  Objection to form.

10              THE WITNESS:  There were a number

11         of refrigerants or product.  Can you be

12         specific on the particular items or

13         product?

14     BY MR. DOROGHAZI:

15         Q     Sure.  I mean, we can go through all the

16     refrigerants that were there, if you'd like.

17         A     I have no -- I can't recall the dates

18     of -- of manufacture of these products.  I mean,

19     there's older product, there's newer product.  I

20     don't remember the dates, specific dates of

21     manufacture.

22         Q     Did you have a sense of whether there was

23     a lot of old manufactured product or new manufactured

24     product?  Did you have any sense of what that blend

25     was?

1                          J. CRAWFORD

2        A      I believe it is.  It's the Schedule A.

3        Q      Yes.  And this Schedule A is a number of

4   terms that were included with the purchase order,

5   right?

6        A      As I recall, yes.

7        Q      And on that page 90, Schedule A, there's

8   a heading called Product Specifications.

9               Do you see that?

10       A      Yes.

11       Q      And one of the -- one of the terms was

12  that:  All products must be legally packaged, DOT

13  compliant and have GHS labeling.

14              Right?

15       A      That's what number two reads.

16       Q      And what did you understand -- well,

17  strike that.

18              I assume you reviewed both the purchase

19  order and the schedule to it when you received it,

20  right?

21              MS. GABAY:  Object to form.

22              THE WITNESS:  I believe I did.

23  BY MR. DOROGHAZI:

24       Q      I think there was an objection to form

25  and I think you said, I believe I did; is that right?

```
 1                    J. CRAWFORD

 2  BY MR. DOROGHAZI:

 3      Q    I understand that you identified wanting

 4  a certain credit limit.

 5           Did you identify in writing in,

 6  responding to the PO, in responding to Star's e-mail,

 7  any other issues with the purchase order that was

 8  received and the terms attached to it?

 9           MS. GABAY:  Objection to form.

10           THE WITNESS:  I -- I don't remember

11           specifically if there was anything in

12           e-mails to any of the other items on the

13           Schedule A that were specifically

14           explicitly disagreed with.

15  BY MR. DOROGHAZI:

16      Q    Did you ever call Star and tell her, we

17  don't agree with Schedule A?

18      A    I can't remember -- I believe we talked

19  via a phone conversation about various things we were

20  working on that were still working through with

21  Schedule A, with the credit.  I can't remember

22  specifically.  Most things were handled through

23  e-mail, but I can't recall specifically if we made --

24  if I made a phone call to her to discuss those

25  particular items.
```

1                          J. CRAWFORD

2   and price, but it also has a Shipping Instructions

3   line, right?

4        A     I see the shipping instructions on the

5   PO.

6        Q     And was your statement, everything looks

7   good, applicable to the shipping instructions too, or

8   just the pricing and quantity?

9             MS. GABAY:  Objection to form.

10            THE WITNESS:  I didn't -- I mean,

11        everything, no, just pricing and quantity

12        were agreeable.

13  BY MR. DOROGHAZI:

14        Q     So, literally, the only thing that -- in

15  these three e-mails, the phrase everything looks good

16  or all looks good, was literally only referring to

17  the pricing and the quantity?

18        A     That's what I was referring to in the

19  place holder PO, in response to that or in reference

20  to that.

21        Q     You also mentioned or you mentioned in

22  your testimony that there was an issue with your

23  credit limit and that had to be resolved, right?

24        A     Right, I recall the credit limit issue.

25        Q     This is going to be marked as Exhibit 11

```
 1                      J. CRAWFORD

 2   and it's going to be Tab 46, and it has a starting

 3   Bates number of HT-0000002244 and it goes through

 4   2273.

 5                 (Crawford Deposition Exhibit No. 11

 6        marked for the record.)

 7   BY MR. DOROGHAZI:

 8        Q     This is an e-mail from you to Star on

 9   September 24th, 2020, right -- sorry -- from Star to

10   you?

11        A     Yes.

12        Q     And this e-mail looks to resolve the

13   credit issue, right?

14        A     I believe we had agreed to set the credit

15   total -- total credit limit at 400,000, total.

16        Q     It says:  We understand you would prefer

17   to allow us a credit limit of 400,000 per PO and

18   therefore will schedule out the four locations on the

19   spreadsheet with total based on our attached PO

20   pricing.

21                 So do you see where I just read?

22        A     Yes.

23        Q     So I read that to mean that there's going

24   to be a credit limit of $400,000 on any particular

25   delivery, and that the delivery is going to be
```

Page 150

1                        J. CRAWFORD

2    scheduled for the various -- for the four locations

3    at various times.  Is that what that's saying?

4         A    The intent was a total aggregate limit of

5    400,000 credit.

6         Q    And did Star agree to that in this

7    e-mail?

8              MS. GABAY:  Objection to form.

9    BY MR. DOROGHAZI:

10        Q    I'll ask it this way.

11             Did you interpret this e-mail as Star

12   agreeing to the credit limit you had proposed?

13        A    I can't recall at the time if I found it

14   to be agreement.  I believe she had -- she agreed

15   400,000 total credit limit was what we were

16   extending.

17        Q    And that's what you had proposed, right?

18             I'm saying the $400,000 credit limit is

19   what you had proposed to Star, right?

20        A    Previously, that's what we had proposed

21   to Hudson is that we wanted to hold total credit

22   exposure to 400,000.

23        Q    And that's what Star is agreeing to in

24   this e-mail, right?

25             MS. GABAY:  Objection to form.

1                    J. CRAWFORD

2              THE WITNESS:  I believe it's my

3         understanding that she was agreeing to

4         the total 400,000 credit limit.

5    BY MR. DOROGHAZI:

6         Q    And the e-mail says -- it also says:

7    Thanks for the call today.

8              Do you remember anything about the

9    telephone call between you and Star that seemingly

10   took place on the 24th of September?

11        A    I don't recall specifically.  I know we

12   had discussions.  I can't remember specifically this

13   call.  I know we -- like I said, I know we did, I

14   can't remember specifics.

15             I know that was the intent is to hold

16   Hudson to a total credit limit of 400,000.  That's

17   what we were comfortable in our exposure to Hudson.

18        Q    Do you remember on that call with Star if

19   you told her that Schedule A to the purchase order

20   was not acceptable?

21        A    I don't recall if that was talked --

22   discussed, the Schedule A was discussed on that call.

23        Q    So I have a question about the purchase

24   order.

25             Which is, assume -- assuming that Hudson

```
 1                         J. CRAWFORD

 2   conversation?

 3        A      The best I recall, it was -- Hudson

 4   has -- I mean, as it happened, Hudson has an issue

 5   with some of our packaging at the Progressive

 6   warehouse, they would like some changes made and, you

 7   know, we -- they're not willing to change -- make the

 8   changes themselves at a discounted price.  They would

 9   like for RGAS to make the changes.

10             And I said -- I can't remember when -- I

11   think I talked to him once I had a plan just, you

12   know, here -- we've got to -- I think it was just an

13   initial -- I don't know if it was an e-mail or a

14   call, to him to say Hudson has issue with our -- some

15   of the packaging at Progressive.  I'm getting more

16   details.  And once I got more details and I talked to

17   Star, kind of recapped with Mr. Combs of what we

18   discussed.

19             They would -- will Hudson make the

20   changes that they're demanding themselves, discount

21   the pricing.  No.  Well, we need to make the changes

22   before they take -- take the product.  Okay, we'll

23   try it first at the very -- it seems to be a very

24   costly, time consuming endeavor.  We'll do the 410A,

25   404A, that Hudson is requiring changes to.  We'll --
```

```
 1                    J. CRAWFORD
 2  and see how that goes.
 3       Q    And that's what you and Mr. Combs decided
 4  in your conversation?
 5       A    He said that was -- you know, we'll see.
 6  He agreed we'll see how that goes in the interest of
 7  moving forward.
 8       Q    Did you and Mr. Combs ever discuss a
 9  proposal where RGAS would be the shipper of record
10  and just ship the gas as-is?  Was that ever
11  discussed.
12       A    I don't recall a conversation
13  specifically to that, no.
14       Q    Did Hudson ever propose that RGAS be the
15  shipper of record, and if that was the case it would
16  accept the gas?  Was that ever -- was that ever
17  proposed, to the best you recall?
18            MS. GABAY:  Objection to form.
19            THE WITNESS:  I believe at
20       Progressive -- I think it was at
21       Progressive they had -- they we just
22       shipped the R22 to them.
23  BY MR. DOROGHAZI:
24       Q    And besides the shipping the R22 at
25  Progressive to them, was there any other -- were you
```

1

2                C E R T I F I C A T E

3

4   STATE OF GEORGIA:

5   FULTON COUNTY:

6

7            I hereby certify that the foregoing

8       deposition was reported, as stated in the

9       caption, and the questions and answers

10      thereto were reduced to written page

11      under my direction, that the preceding

12      pages represent a true and correct

13      transcript of the evidence given by said

14      witness.

15           I further certify that I am not of

16      kin or counsel to the parties in the

17      case, am not in the regular employ of

18      counsel for any of said parties, nor am I

19      in any way financially interested in the

20      result of said case.

21           Dated this 25th day of April, 2022.

22

23      *Tanya L. Verhoven-Page*
        _____
24      Tanya L. Verhoven-Page,
        Certified Court Reporter,
        B-1790.

25