UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――――――――――

HUDSON TECHNOLOGIES, INC., *et al.*,

                      Plaintiffs,

           -v-

RGAS, LLC,

                      Defendant.

21-CV-297 (JPO)

OPINION AND ORDER

―――――――――――――――――――――――――――――――――

J. PAUL OETKEN, District Judge:

    Hudson Technologies, Inc. and Hudson Technologies Company (collectively, "Hudson") bring this action against RGAS, LLC ("RGAS"), asserting breach of a contract concerning the sale of refrigerants. Before the Court are Hudson's motion for partial summary judgment on liability and RGAS's cross-motion for summary judgment.

    For the reasons that follow, the Court grants Hudson's motion for summary judgment in part and denies it in part, and it denies RGAS's cross-motion for summary judgment.

**I.    Background**

    **A.    Factual Background**

    The following facts are drawn from Hudson's Local Rule 56.1 Statement (ECF No. 97-2), RGAS's Response to Hudson's Rule 56.1 Statement and RGAS's own Rule 56.1 Statement (ECF No. 125 ("Def.'s SOF Opp.")), Hudson's Response to RGAS's Rule 56.1 Statement (ECF No. 139 ("Pl.'s SOF Opp.")), and RGAS's subsequent Response to Hudson's Response (ECF No. 148). The facts recited here are undisputed unless otherwise noted, and they are construed in the light most favorable to the nonmovant.

    Hudson is a provider of refrigerant products and services to the heating, ventilation, air conditioning, and refrigerant industry. (Def.'s SOF Opp. ¶ 1.) RGAS is a supplier of

refrigerants and refrigerant lifecycle management services. (Pl.'s SOF Opp. ¶ 65.) In mid-2020, RGAS determined that it should liquidate its inventory of refrigerant gas products and began pursuing a sale of all its inventory. (Def.'s SOF Opp. ¶¶ 4-6.) Both parties agree that the most desirable product in RGAS's inventory was a particular gas, R-22 refrigerant gas ("R-22"). (*Id.* ¶ 7.) Due to R-22's environmental effects, however, the Environmental Protection Agency (EPA) restricted the production of new R-22 after January 1, 2020, but permitted the use of "used, recovered and recycled" R-22. (*Id.* ¶ 8 (citing 42 U.S.C. § 7671d(a)).)

On August 7, 2020, RGAS's President, Jason Crawford, contacted Hudson's CEO, Brian Coleman, identifying RGAS's refrigerant inventory and requesting that Hudson make an offer for that inventory. (*Id.* ¶ 10; ECF No. 97-10.) Hudson and RGAS employees exchanged a series of emails discussing the price for various gases (*see* ECF No. 97-12), and on September 16, 2020, Crawford sent Hudson an email stating that it "agree[d] to [Hudson's] pricing" as outlined in prior emails (*id.* at 2; Def.'s SOF Opp. ¶ 13). The price per pound of R-22 in the bid was $9.36. (Def.'s SOF Opp. ¶ 14; ECF No. 97-14, 97-15.)

On September 23, 2020, Hudson sent RGAS an email with a "[P]urchase [O]rder in the initial amount of $2,793,115.48." (ECF No. 97-17 at 2; *see also* Def.'s SOF Opp. ¶ 16.) That email included an attachment, Schedule A, that listed various terms and conditions. (Def.'s SOF Opp. ¶ 16; ECF No. 97-17 at 6-8.) Among other details, Schedule A enumerated certain product specifications, including that "[a]cceptance of product" would be "conditional upon successful inspection of cylinders and weight verification of gas" and that "[a]ll product must be legally packaged, DOT compliant, and have GHS labeling." (ECF No. 97-17 at 7; *see also* Def.'s SOF Opp. ¶ 18.) In the email with the purchase order, Hudson asked RGAS to "review both the pricing as well as the terms and conditions as listed on page 2 (schedule A)" and noted that "this

is a placeholder PO, we will issue POs per location and possibly several per location upon the completion of the inspections and our acceptance of product." (ECF No. 97-17 at 2.) The same day Hudson sent the purchase order, Crawford responded to Hudson: "[A]ll looks good. We would like to hold the credit limit to $400,000. Will this be a problem?" (ECF No. 97-19 at 2.) The next day, Hudson and RGAS agreed to a credit term. (Def.'s SOF Opp. ¶ 25.) After that email exchange, RGAS proceeded to sell its product to parties other than Hudson, such that its inventory continued diminishing over time. (Pl.'s SOF Opp. ¶ 97.)

Hudson made initial arrangements to conduct inspections at the four warehouses containing RGAS's product. (Def.'s SOF Opp. ¶ 28.) Because refrigerant gases are considered hazardous materials under several federal regulatory schemes, they are required to have certain markings to warn of dangers to personal health and the environment for purposes of transport, handling, and use. (*Id.* ¶ 30 (citing 29 C.F.R. § 1910.1200; 40 C.F.R. § 82.106; 49 C.F.R. § 178.35, 178.65).) Upon inspecting the product at the first of four warehouses, Hudson believed that the products were missing markings required by the Department of Transportation (DOT). (*Id.* ¶ 29.) Hudson also represents (although RGAS disputes) that it believed that the products were also not compliant with requirements promulgated by the EPA and the Occupational Safety and Health Administration (OSHA). (*Id.*)

On September 28, 2020, Hudson notified Crawford of the results of the first inspection and stated that it would accept the properly labeled product at the time, but the other gases would have to be relabeled before Hudson could accept them. (*Id.* ¶ 32.) That same day, Crawford directed Hudson to issue purchase orders for the acceptable product, and he requested additional information about what markings would be needed for the remaining products. (*Id.* ¶ 33; ECF No. 97-25.) On October 1, 2020, a Hudson employee emailed another Hudson employee

3

ordering that the warehouse inspections of RGAS products be paused. (Def.'s SOF Opp. ¶ 34; ECF No. 97-27 at 2.) Crawford also inquired of Hudson what its "discount prices" would be if it "took the product as is and handled the relabeling in house." (ECF No. 97-28 at 2.)

RGAS then shipped Hudson certain quantities of R-22, as well as other gases, R-404 and R-410, which RGAS relabeled. (*See* Def.'s SOF Opp. ¶ 39; Pl.'s SOF Opp. ¶¶ 118, 120; ECF No. 97-50 at 3.) RGAS made arrangements to ship the R-22 to Hudson and Hudson paid for the cost of freight. (Def.'s SOF Opp. ¶ 40.) Inspections then resumed at the remaining warehouses while RGAS relabeled the R-404 and R-410 gases. (*Id.* ¶ 45.) On November 4, 2020, Hudson believed that the product at another warehouse was also inadequately labeled (*id.* ¶ 48), and it developed the same belief for product at the remaining warehouses (*id.* ¶ 49). Hudson notified RGAS of the perceived deficiencies but conveyed that it would accept all of Hudson's R-22, regardless of purported labeling deficiencies, if RGAS agreed to be responsible for shipping the product. (*Id.* ¶ 50.)

Hudson then issued purchase orders for products that it deemed to be in compliance, but Crawford advised Hudson on November 12, 2020 that it would not accept any more purchase orders and was "not moving forward at this time." (*Id.* ¶¶ 51, 53, ECF No. 97-42 at 2.) On November 30, 2020, RGAS issued an invoice for the R-404 and R-410 gases at the first warehouse after RGAS completed the labeling, and that product was transferred to Hudson. (Def.'s SOF Opp. ¶ 55; ECF No. 97-44, 97-45.) RGAS never transferred any inventory from the other three warehouses to Hudson, which included the vast majority of the R-22 and some product that Hudson had identified as compliant and acceptable. (Def.'s SOF Opp. ¶ 57.) Over the following months, RGAS proceeded to sell its inventory of R-22 for a price that was higher than the price that Hudson quoted in its purchase order. (*Id.* ¶ 58.)

B.     **Procedural History**

Hudson filed this action on January 13, 2021, asserting breach of contract and seeking damages, interest, and attorney's fees.  (ECF No. 1.)  On February 4, 2021, RGAS filed an answer.  (ECF No. 7.)  On May 24, 2022, the Court denied a motion by RGAS to amend its answer.  *Hudson Techs., Inc. v. RGAS, LLC*, No. 21-CV-297, 2022 WL 1644913 (S.D.N.Y. May 24, 2022) (ECF No. 73).

On February 9, 2023, Hudson filed a motion for partial summary judgment, requesting that the Court grant its motion as to liability and proceed to a trial on damages.  (ECF No. 97.)  On March 7, 2023, RGAS filed an opposition to Hudson's motion and its own cross-motion for summary judgment on issues related to both liability and damages.  (ECF Nos. 123, 124.)  On April 4, 2023, Hudson filed a reply in support of its motion for partial summary judgment and an opposition to RGAS's cross-motion for summary judgment.  (ECF No. 138.)  And on April 27, 2023, RGAS filed a reply in support of its motion for summary judgment.  (ECF No. 147.)  Both parties have filed motions to exclude the other side's expert testimony (ECF Nos. 98, 110, 115), and RGAS has also filed a motion in limine to preclude Hudson from presenting argument, evidence, and testimony concerning certain damages theories (ECF No. 119).

II.    **Legal Standard**

To survive summary judgment, a nonmovant must raise a genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c).  To raise such an issue requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts."  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Moreover, a nonmovant "may not rely on conclusory allegations or unsubstantiated speculation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).  Rather, they "must offer some hard evidence showing

that [their] version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

The movant can prevail if, after discovery, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks and citation omitted). If the movant does produce evidence tending to exclude the possibility of a genuine dispute of material fact, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks and citation omitted) (emphasis in original). In cases involving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

**III.   Discussion**

To recover for breach of contract, "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). Hudson moves for partial summary judgment as to liability (*i.e.*, as to the first three elements of a breach of contract claim). RGAS moves for partial summary judgment on issues related to both liability and damages.

The Court partially grants Hudson's motion and concludes that, as a matter of law, a contract existed between Hudson and RGAS for the purchase of refrigerants. The Court denies the remainder of Hudson's motion as well as RGAS's motion as to liability, as genuine disputes

remain.  In particular, neither party establishes whether the contract at issue is a single delivery contract or installment contract, which dictates the relevant standard of breach.  Accordingly, the Court cannot grant summary judgment to either party at this time on issues related to breach.  The Court also denies RGAS's motion as to damages, as it is premature to decide issues of damages prior to establishing liability.  As a result, the Court grants Hudson's motion for summary judgment in part and denies it in part, and it denies RGAS's motion for summary judgment in full.[1]

### A. Existence of a Contract

The question of "'whether a binding agreement exists is' generally a legal question for the court to decide." *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 486-87 (S.D.N.Y. 2022) (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008)).  Moreover, "[s]ummary judgment on a contract interpretation dispute is clearly permissible when the language of the contract provision in question is unambiguous." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997).  Thus, "[i]f the court finds that the contract is not ambiguous[,] it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence," and "it may then award summary judgment." *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal quotation marks and citation omitted).

---

[1] The Court need not resolve Hudson's motion to partially exclude Robert Richard's expert report (ECF No. 98) or RGAS's motion to exclude Claire Matlon's expert report (ECF No. 110), as the Court resolves the present summary judgment motions without reaching the issues on which Richard's and Matlon's reports opine.  Similarly, the Court need not resolve RGAS's motion to exclude Kevin Dennis's expert report (ECF No. 115) or RGAS's motion to preclude argument, evidence, and testimony concerning certain damages theories (ECF No. 119), as the Court ultimately concludes that it is premature to decide issues related to damages before liability has been established.  Accordingly, those four motions are denied as moot and without prejudice to renewal at a later stage.

The Court concludes as a matter of law that Hudson and RGAS entered into a binding contract on September 23, 2020 that obligated RGAS to deliver specified quantities of refrigerants. For a contract to form, there must be a "'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)). That manifestation of mutual assent "must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289. "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.*

Here, Hudson's transmission to RGAS of a purchase order listing specific gases, quantities, and prices, among other terms (*see* ECF No. 97-17), together with RGAS's response of "all looks good" (ECF No. 97-19 at 2), indicated a mutual understanding between the parties regarding the creation of a binding agreement. *See, e.g., Anhui Konka Green Lighting Co., Ltd. v. Green Logic LED Elec. Supply, Inc.*, 625 F. Supp. 3d 269, 280-81 (S.D.N.Y. 2022) (concluding on summary judgment that "the parties entered into enforceable agreements . . . that were documented in the purchase orders, which set forth the material terms of the transactions"). RGAS does not point to any key missing terms, and it manifested its assent to the Hudson's detailed purchase order. *See Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 58 (2d Cir. 2017) (identifying quantity and price as key terms in a contract for goods); *Nusbaum v. E-Lo Sportswear LLC*, No. 17-CV-3646, 2017 WL 5991787, at *4 (S.D.N.Y. Dec. 1, 2017) (concluding that a "series of emails . . . form[ed] a binding contract" because the "emails demonstrate[d] a 'meeting of the minds' on essential terms"). Although RGAS's response accepting the purchase order left open a credit term, it is undisputed that the credit term was

8

promptly resolved the next day.  (Def.'s SOF Opp. ¶ 25.)  To the extent that any more specific terms were missing, the New York U.C.C. governs contracts for the sale of goods, and the "U.C.C. is particularly forgiving of indefinite terms."  *Alessi*, 578 F. Supp. at 492 (internal quotation marks and citation omitted).[2]

Both Hudson and RGAS began performing on the terms of the contract, and the "parties' substantial partial performance on the contract weighs strongly in favor of contract formation." *NYKCool A.B. v. Pac. Fruit, Inc.*, 507 F. App'x 83, 86 (2d Cir. 2013) (summary order).  Here, the purchase order specified that Hudson would inspect the product and accept it "conditional[ly] upon successful inspection of cylinders and weight verification of gas" (ECF No. 97-17 at 6-7), and accordingly, Hudson began inspecting the product shortly after the parties agreed to the contract's terms (Def.'s SOF Opp. ¶¶ 28, 32).  When Hudson notified RGAS that it believed that certain gases were not adequately labeled, RGAS reacted by agreeing to cure the alleged deficiencies and continuing to perform the contract's terms.  (*See id.* ¶ 39; Pl.'s SOF Opp. ¶¶ 118, 120; ECF No. 97-50 at 3.)  Thus, RGAS's initial actions in accordance with the contract's terms further support the conclusion that a contract was formed.  *See R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984) ("[P]artial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect.").

---

[2] RGAS briefly asserts that even if a contract had been formed, the terms and conditions in Schedule A attached to the purchase order were not part of the contract.  (ECF No. 124 at 6.) As Hudson points out, however, the purchase order states in bold, red, all-caps font that acceptance of the product would be conditional upon verifying compliance with the "TERMS ON SCHEDULE A."  (ECF No. 97-17 at 6.)  Thus, "a reasonable person would understand" Schedule A "to be incorporated by reference" into the terms of the contract, and the Court considers it to be so incorporated.  *Miller v. Mercuria Energy Trading, Inc.*, 291 F. Supp. 3d 509, 517 (S.D.N.Y. 2018).

RGAS advances a litany of arguments for why the parties did not enter into a binding contract in September 2020, but they all fail.  RGAS begins by citing language in Hudson's email that referred to a "placeholder P[urchase] O[rder]" and indicated that Hudson would "issue POs per location and possibly several per location upon the completion of the inspections and our acceptance of product" to contend that no contract ever formed.  (ECF No. 97-18 at 2.)  In context, though, the "placeholder" language simply indicated that there would be additional purchase orders with details specific to each warehouse, while the purchase order RGAS did receive was a master purchase order listing the products and prices across all four warehouses.  Indeed, subsequent purchase orders issued for specific warehouses were explicitly labeled as a "[p]ortion of PO," suggesting that the master purchase order constituted the full contract.  (ECF No. 97-50 at 6, 7.)  RGAS cites no evidence demonstrating that it understood the "placeholder" term in the way it does now.  To the contrary, Crawford forwarded the "placeholder" purchase order to RGAS's owner, explaining that "[e]verything looks good and we are scheduling warehouse inspections this week," showing that he understood RGAS to be moving ahead with performance.  (ECF No. 97-22 at 2.)  And as explained earlier, that subsequent performance belies RGAS's suggestion that the purchase order was not an actual contract.  *Cf. Am. Com. Lines, LLC v. Water Quality Ins. Syndicate*, 403 F. Supp. 3d 312, 325 (S.D.N.Y. 2018) ("The parties' post-execution course of conduct constitutes relevant, probative evidence.").  For similar reasons, the fact that RGAS failed to reconfirm its acceptance does not undermine the conclusion that a contract formed, as the initial offer and acceptance had already occurred by that point and the parties had been acting pursuant to the resulting contract.  (*See* ECF No. 138 at 8.)

RGAS then cites testimony by various RGAS and Hudson employees to contend that the parties did not subjectively believe that they had entered into a contract.  For example, RGAS

10

cites testimony from Crawford that when he wrote that "all looks good," he was referring to only the accuracy of the price and quantities of product that RGAS had at that time (ECF No. 124 at 6-7), as well as testimony from a senior Hudson employee, in which he allegedly describes the purchase order as non-final in nature (*id.* at 7-8).  But in determining whether two parties have formed a contract, "the court looks not to the[] [parties'] after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time of contracting."  *Alessi*, 578 F. Supp. 3d at 497 (internal quotation marks and citation omitted); *see also Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Mkts. N.A., Inc.*, 841 F. Supp. 2d 762, 767 (S.D.N.Y. 2012) ("[I]f a party's objective actions support the conclusion that he accepted an agreement, he will be bound to it even if he never subjectively assented to the terms of the agreement.").  As a result, even if RGAS's characterization of the statements by Crawford and Kestenbaum are accurate (which Hudson contests), they have no bearing on whether Hudson and RGAS formed a contract.

RGAS next suggests that no contract was formed in September 2020 because Hudson issued a revised proposal to RGAS in October and then requested updated inventory counts in November.  (ECF No. 124 at 8-9.)  But as Hudson explains, those actions are best understood to constitute continued attempts by Hudson to get RGAS to perform on the original contract and to deliver the agreed-upon products, rather than evidence that no contract existed at all.  The only authority RGAS cites addresses the principle that a subsequent offer constitutes revocation of a prior offer, but that authority addresses a different situation in which the prior offer was not yet accepted.  (*See* ECF No. 124 at 9.)  That is not the case here, as RGAS's acceptance of the purchase order on September 23, 2020 created a binding contract.

11

Finally, RGAS contends that the purchase order's specification that Hudson would accept RGAS's product only upon inspection was a condition precedent to contract formation, or, alternatively, to RGAS's obligation to perform. (ECF No. 124 at 9-11.) As explained earlier, RGAS is correct that pursuant to the contract, Hudson's "[a]cceptance of product" was "conditional upon successful inspection of cylinders and weight verification of gas." (ECF No. 97-17 at 6-7.) But that right of inspection is codified in the U.C.C., which gives buyers the "right before payment or acceptance to inspect" the goods at "any reasonable place and time and in any reasonable manner." N.Y. U.C.C. § 2-513(1). Indeed, the U.C.C. explicitly gives buyers a right to inspect goods in advance of delivery—the right Hudson exercised here—as it authorizes inspection of any "goods . . . tendered or delivered or *identified to the contract for sale*." *Id.* (emphasis added). Here, because the gases were "identified to the contract," Hudson's right to inspect them was a right it gained by virtue of the contract's formation and a right it gained even before delivery occurred. *See Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 274 (S.D.N.Y. 2002). As Hudson explains, construing the right to conduct an inspection to be a condition precedent would mean that contracts would be binding only if the seller tendered acceptable products. Such a view would render remedies for nonconforming products forever unavailable to buyers who codify their right to pre-delivery inspection, as on that view, no contract would have been formed in the first place if the goods were unsatisfactory. (*See* ECF No. 138 at 10-12.) That cannot be how the U.C.C. works.

The Court therefore grants Hudson's motion for summary judgment as to liability in part, concluding that Hudson and RGAS formed a valid, binding contract on September 23, 2020.

B.     **Breach of the Contract**

Both Hudson and RGAS claim that the other breached the contract first. On Hudson's view, RGAS materially breached the contract because it failed to provide product that complied with the terms of the purchase order, and because it refused to deliver the vast majority of the agreed-upon product. (ECF No. 97-1 at 16-21.) On RGAS's view, Hudson breached the contract first because RGAS's goods did indeed comply with the terms of the purchase order and any lack of compliance was trivial, meaning Hudson improperly rejected the goods. (ECF No. 124 at 11-16.)

Before the Court can determine who first breached the contract, however, it must first determine the relevant standard for breach. That standard turns on whether the contract at issue is a single delivery contract or is an installment contract, which the U.C.C. defines as a contract that "requires or authorizes the delivery of goods in separate lots to be separately accepted." N.Y. U.C.C. § 2-612(1).

For single delivery contracts, the U.C.C.'s perfect tender rule applies, under which a buyer can reject goods if they "fail in any respect to conform to the contract." *Id.* § 2-601. Hudson insists that the perfect tender rule is applicable here, thereby appearing to suggest that the contract at issue is a single delivery contract and not an installment contract. (ECF No. 138 at 13-16.) In contrast, RGAS contends that the contract is instead an installment contract (ECF No. 124 at 16 & n.2), which would render the perfect tender rule inapplicable. Instead, the U.C.C. limits a buyer's rejection of an installment to circumstances in which "the non-conformity substantially impairs the value of that installment and cannot be cured." *Id.* § 2-612(2). That rule "is designed to further the continuance of the contract in the absence of an overt cancellation" and prevents a party from canceling a contract due to trivial defects. *Dell's*

13

*Maraschino Cherries Co., Inc. v. Shoreline Fruit Growers, Inc.*, 887 F. Supp. 2d 459, 472 (E.D.N.Y. 2012) (quoting N.Y. U.C.C. § 2-612, cmt. 6).  As a leading treatise explains, then, "the buyer's right to reject under an installment contract is far more limited than the buyer's right to reject under a single delivery contract . . . in which the so-called 'perfect tender rule'" applies.  15 Williston on Contracts § 45:21 (4th ed. 2023); *see also Ho Myung Moolsan, Co. Ltd. v. Manitou Min. Water, Inc.*, No. 07-CV-7483, 2010 WL 4892646, at *3 (S.D.N.Y. Dec. 2, 2010) (explaining that the "standard for determining breach [for installment contracts] differs from that for single-lot contracts in that, for the latter, if the goods or the tender of delivery fail in any way to conform to the contract, a breach has occurred").

      The Court cannot conclude on the arguments and record before it whether the contract between the parties is a single delivery or an installment contract, meaning neither party has carried its burden to show that there is no genuine dispute of material fact as to breach.  The parties' argumentation on the issue is surprisingly thin.  RGAS only briefly asserts, without justification, that the contract is an installment contract (*see* ECF No. 124 at 16), and the majority of its relevant briefing addresses whether its products suffered from substantial impairments but not how those products would fare under the perfect tender rule (*see id.* at 14-17).  Hudson, for its part, appears to simply assume that the contract is a single delivery contract that is subject to the perfect tender rule.  (*See* ECF No. 138 at 13-16.)

      To be sure, there appears to be some evidence suggesting that the contract at issue is an installment contract, which would subject it to the provisions of U.C.C. § 2-612.  The U.C.C. defines installment contracts broadly, as it does not confine the definition of an installment contract to those that *require* multiple deliveries.  Rather, "the definition of an installment contract includes coverage of installment deliveries tacitly authorized by the circumstances or by

14

the option of either party." *Ho Myung Moolsan*, 2010 WL 4892646, at *3 (citing N.Y. U.C.C. § 2-612, cmt. 1).  Thus, a contract "may be classified as an installment contract" if it "permits . . . the seller to deliver fewer than all of the goods at one time."  15 Williston on Contracts § 45:2.

Here, the contract between Hudson and RGAS specified that "Hudson will arrange freight" and that the delivery date was "TBD- after completion of inspections."  (ECF No. 97-17 at 6 (capitalization altered).)  Moreover, the parties' course of performance also suggests that the contract authorized separate deliveries, as Hudson planned to perform the inspections over a period of time, and it asked for and accepted shipments of certain quantities of gases at various times.  (*See, e.g.*, Def.'s SOF Opp. ¶ 39, 45; Pl.'s SOF Opp. ¶¶ 118, 120.)  Thus, the contract arguably "authorizes the delivery of goods in separate lots to be separately accepted," which would render it an installment contract.  N.Y. U.C.C. § 2-612(1); *see also* 15 Williston on Contracts § 45:2 (a contract "may be regarded as an installment contract under the Code" even if "neither the buyer's purchase order nor the seller's acknowledgment contains a clause explicitly allowing or calling for separate deliveries at separate times, as long as the contract tacitly authorizes delivery in installments").

On the other hand, at least one court has suggested that a contract may not be an installment contract even if delivery occurs in multiple lots, as U.C.C. "§ 2-307 provides that even in non-installment contracts, delivery may be in lots if the circumstances warrant it, and payment in such cases may be demanded lot by lot."  *Stinnes Interoil, Inc. v. Apex Oil Co.*, 604 F. Supp. 978, 981 (S.D.N.Y. 1985).  Accordingly, in a situation like this, that court observed that "the import of [an] earlier delivery . . . in separate lots which were separately invoiced and paid for is not at all clear," as the "delivery of lots could signify an installment contract equally as

15

well as it could signify a unitary contract with delivery in lots." *Id.* "Which characterization is correct," the court concluded, "is a question of fact." *Id.*

The Court does not resolve whether the contract is a single delivery contract or an installment contract at this juncture because neither party adequately justifies its characterization it as either one. As a result, neither party carries its burden to show that, as a matter of law, the opposing party breached the contract. If the contract were indeed an installment contract, it would raise a host of additional questions whose answers are not clear from the current record and the parties' briefing. For example, breach of an installment contract requires a showing of "substantial impairment," and "[w]hether a breach constitutes 'substantial impairment' is a question of fact" that is not fully addressed in the briefs. *Emanuel L. Outlines, Inc. v. Multi-State Legal Studs., Inc.*, 899 F. Supp. 1081, 1087 (S.D.N.Y. 1995); *see also* 15 Williston on Contracts § 45:22 ("Whether a nonconformity in an installment rises to the level of substantial impairment of the value of the installment . . . is a question of fact."). Similarly, if the contract were a single delivery contract, RGAS has not adequately addressed how its products would fare under the perfect tender rule. As a result, the Court denies both RGAS's and Hudson's motions for summary judgment on issues related to breach at this time.[3]

### C. Damages

RGAS asks this Court to conclude on summary judgment that Hudson is not entitled to any lost profits damages as a matter of law. (*See* ECF No. 124 at 20-25; ECF No. 147 at 2-9.)

---

[3] Because neither party has established the applicability of the relevant standard to determine breach, the Court does not proceed to the subsequent issues of whether RGAS's products complied with certain regulations and whether such compliance was required by the terms of the contract. As a result, the Court denies as moot Hudson's motion to partially exclude Robert Richard's expert report (ECF No. 98) and RGAS's motion to exclude Claire Matlon's expert report (ECF No. 110), as those reports address whether RGAS's product complied with certain regulations—an issue the Court need not reach.

Because it is unclear at this point who is liable for breach, the Court concludes that RGAS's "motion is premature because [it] seeks an adjudication on damages prior to a determination of liability," and it "is axiomatic that summary judgment as to damages can only follow a determination that damages are in fact owed (*i.e.*, that the defendant is actually liable for damages)." *Lovely H. v. Eggleston*, No. 05-CV-6920, 2012 WL 4459463, at *2 (S.D.N.Y. Sept. 19, 2012). Thus, when "neither party's liability has been finally adjudicated," as is the case here, courts have determined that "any analysis of damages at [that] stage would be premature." *Delshah 60 Ninth, LLC v. Free People of PA, LLC*, No. 20-CV-5905, 2022 WL 4228213, at *20 (S.D.N.Y. June 29, 2022) (quoting *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 450-51 n.6 (S.D.N.Y. 2014)); *see also Capitol Vial, Inc. v. Int'l Bioproducts, Inc.*, 980 F. Supp. 628, 634 (N.D.N.Y. 1997) (determining that a party's motion for "partial summary judgment to limit the amount of damages for which it can possibly be held liable" was premature because the court had "found genuine issues of material fact surrounding possible breaches by both parties"); *Gen. Elec. Co. v. APR Energy plc*, No. 19-CV-3472, 2021 WL 2418586, at *15 (S.D.N.Y. June 11, 2021) ("[U]ntil liability has been adjudicated, the issue of damages is not ripe and may ultimately be moot.").

Indeed, courts in similar circumstances have suggested that resolving motions about damages on summary judgment prior to a determination on liability would be "tantamount to [issuing] advisory opinions," *Marshall Contractors, Inc. v. Peerless Inc. Co.*, 827 F. Supp. 91, 93 (D.R.I. 1993) (citing *Flast v. Cohen*, 392 U.S. 83, 88 (1968)), and might therefore represent an improper expansion of "the role of the courts under Article III," which "is confined to passing

upon an actual case or controversy," *Transcience*, 50 F. Supp. 441 at 450-51 n.6 (internal quotation marks and citation omitted).[4]

## IV. Conclusion

For the foregoing reasons, Hudson's motion for partial summary judgment is GRANTED IN PART and DENIED IN PART. RGAS's motion for summary judgment is DENIED.

Hudson's motion to partially exclude Robert Richard's expert report; RGAS's motion to exclude Claire Matlon's expert report; RGAS's motion to exclude Kevin Dennis's expert report; and RGAS's motion to preclude argument, evidence, and testimony concerning certain damages theories are DENIED for the reasons explained in footnotes 1, 3, and 4.

The parties' remaining motions to seal (ECF Nos. 114, 135, 143, 146, and 157) are GRANTED.

The Clerk of Court is directed to close the motions at ECF Numbers 97, 98, 110, 114, 115, 119, 123, 135, 143, 146, and 157.

SO ORDERED.

Dated: February 12, 2024
       New York, New York

                                        _____
                                             J. PAUL OETKEN
                                        United States District Judge

---

[4] Because the Court concludes that it is premature to decide issues related to damages, the Court denies as moot RGAS's motion to exclude Kevin Dennis's expert report (ECF No. 115) and RGAS's motion to preclude argument, evidence, and testimony concerning certain damages theories (ECF No. 119).